[Civ. No. 27648. Second Dist., Div. One. Dec. 27, 1963.]

HI-VALLEY DEVELOPMENT CORPORATION, Plaintiff and Appellant, v. BYRON J. WALTERS, Intervener and Respondent.

Harry S. Apter for Plaintiff and Appellant.

Block, Toler, Bulloch & Biggerstaff and Lloyd A. Bulloch for Intervener and Respondent.

LILLIE, J.—Plaintiff (appellant) sued, among others, Continental Capital Corporation (hereinafter referred to as CCC) and attached, as property belonging to it, $12,375 in escrow. Thereafter, Byron J. Walters (respondent) filed a complaint in intervention against all parties claiming to be owner of the funds. Meanwhile, in the main action, plaintiff dismissed all defendants except CCC; judgment was entered against it in favor of plaintiff in the sum of $13,312. Trial on the complaint in intervention resulted in judgment against plaintiff; it appeals therefrom.

Viewing the evidence in a light most favorable to respondent (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427 [45 P.2d 183]; *Primm* v. *Primm*, 46 Cal.2d 690 [299 P.2d 231]; *Grainger* v. *Antoyan*, 48 Cal.2d 805 [313 P.2d 848]), we briefly set forth the facts leading up to the attachment. On November 10, 1960, Walters, seeking a loan of $1,100,000 to build a hotel on certain properties in Idyllwild, deposited in the bank in escrow the sum of $17,875 ($12,375 was to be paid "to the lending institution for the standby fee for [Walters'] formal commitment," and $5,500 was paid to Contractors Counseling Services Inc. [hereinafter referred to as CCS] and for escrow charges), and executed and delivered to the bank escrow instructions acknowledging a deposit of a letter dated November 1, 1960, (Exs. 1 and B) the basic agreement between Walters and CCS. According to the instructions the closing of escrow was conditioned upon receipt by the bank of written instructions from Walters stating that he had received and accepted a "standby" loan commitment to be furnished by CCS. The letter agreement (Exs. 1 and B) offered to Walters a construction loan of $1,100,000 subject to certain contingencies, i.e. CCS's assumption of the accuracy and authenticity of his figures and information, and subject to approval of CCS's "lending source." Neither the escrow instructions nor the letter agreement mentioned CCC. While CCS was agent of the lending source, none of the documents identifies the "lending source," and the lender was not identified to Walters. The agreement further provided that in the event "the standby agreement from the lending institution is not delivered" to Walters "in accordance with the above-enumerated terms within 30 days, then all remaining funds in the escrow ... will be immediately refunded" to him. The standby commitment was never delivered and nothing was ever heard from the lending institution.

Although a formal commitment had not been delivered to Walters, and no money was yet due under the letter agreement, Walters, five days later, on November 15, 1960, and in order to facilitate matters, prematurely directed the bank to disburse $12,375 to CCC (it developed that CCS was agent for CCC) and notify the latter that he had accepted a loan commitment provided by CCS. However, the bank, apparently recognizing that the sum was not yet due CCC or anyone else, and perhaps exercising sounder judgment than the intervener, did not make the disbursement; the sum remained in escrow, which was never closed. The bank's answer to the Notice of Garnishment alleged that it was still holding the $12,375 in escrow subject to escrow instructions.

After Walters had directed the bank to disburse the $12,375, a letter from CCC (another agent of the lending source) dated November 10, 1960, and "approved and accepted this 18th day of November 1960" by Walters, was filed in escrow. This letter was approved by Walters three days *after* he had instructed the bank to pay the funds to CCC; it made the loan commitment subject to *further* conditions and to final plans and specifications approved by "Continental Capital Corporation *and* the lender," and changed the amount of the loan. Thereafter, on November 22, 1960, the bank advised CCC in writing (Ex. 16) that the $12,375 was there "payable upon receipt and acceptance of the commitment"; CCC never replied. On December 14, 1960, CCS in writing (Ex. I) advised Walters that CCC wired "that all commitments made by them will be funded prior to the first of the year." On January 19, 1961, CCS wrote to CCC advising of "extreme delay" necessitated by a "complete revision of preliminary plans." (Ex. J.) There was no merit to the statements of delay therein.

Thereafter on January 23, 1961, CCC wrote to Walters advising him that they had "cancelled this commitment on November 22, 1960" on grounds they had not received the $12,375 and had not received any papers from CCS "which would allow us to make an analysis of this loan" (Exs. G and J), although CCS received the plans as early as November 10, 1960. On January 25, 1961, the bank was served with Notice of Garnishment in the principal action by virtue of plaintiff's Writ of Attachment against CCC. On February 4, 1961, CCC again wrote to Walters (Ex. L) asserting it had "originally cancelled our deal on November 22nd . . .," disclaiming any interest in the $12,375 in escrow, and alleging

"this money was yours in title as well as in fact all of this time"; it also requested Walters to direct all correspondence to CCS and advised him it had checked "a very good Insurance Company who is interested in making these types of loans," requesting from him a "feasibility and evaluation report" concerning his project. Walters, who was anxious for a loan, wrote to CCC on February 9, 1961, (Ex. F) referring to the transactions and advising that he had instructed its bank to forward the sum of $12,375, for some reason the bank had not done so and cancellation of its commitment was unacceptable to him; however, CCC did not respond and Walters did not get his loan.

Appellant advances numerous points but in the main contends that the evidence is insufficient to sustain the finding that Walters was the owner of the funds at the time of the levy; that the only issue on pretrial was ownership of the funds which precluded proof of failure of consideration, fraud and deceit and breach of contract between CCC and Walters; that Walters' "interest" is not sufficient to sustain a complaint in intervention; and that no issue was joined thereunder by virtue of the intervener's failure to serve CCC.

On the issue of sufficiency of the evidence, there is abundant proof in the record that on January 25, 1961, Walters was the owner of the $12,375 held by the bank in escrow. It is clear that the provision of the agreements were subject to certain contingencies which were never realized and conditions which never occurred, thus, CCC was never entitled to the $12,375 in escrow. This is true even though, at a time when no money was due, Walters, apparently overanxious for the loan, directed the bank to pay the funds to CCC; no money was in fact payable to CCC, who had not even been mentioned in the escrow agreements, and the standby fee was to be paid to the lending institution. Moreover inasmuch as conditions for the payment of the standby fee had not been, and were never, met, no money became due, and payment by the bank was never in fact made. The record supports the view of the lower court that there was a breach of contract and a total failure of consideration in the contract, thus title to the money never passed to CCC or anyone else. Walters' instruction to the bank to pay the $12,375 to CCC was never carried out; the bank at no time transferred the money out of escrow and the escrow was never closed. Further, when the bank informed CCC of Walters' instruc-

tion it did not even respond; CCC has at no time ever demanded or claimed the money. Even assuming that on November 15, 1960, when Walters' issued his premature instruction to the bank to pay the money to CCC, the latter acquired some interest in the money, there is no question but that it lost the same when seven days later it cancelled its purported commitment and in writing expressly disclaimed any interest in the $12,375. Under such circumstances it would appear that a transfer or reassignment to Walters by CCC of any interest it might have had in the funds was effected long prior to the attachment of January 25, 1960.

It is the rule that at the time of levy the attaching creditor stands in no better position than, and attains no greater right in the attached property than does, the debtor. (*Garcia* v. *Merlo,* 177 Cal.App.2d 434 [2 Cal.Rptr. 590].) A creditor's suit will not lie to reach assets for which the judgment debtor himself has no actionable demand and which he could not recover in an action in his own name. (*Dawson* v. *Bank of America,* 100 Cal.App.2d 305 [223 P.2d 280].) The record shows that at the time of the levy the funds in question belonged to Walters and that CCC neither had such an interest in the $12,375 as would permit it to demand the money or dispose of it adversely to others, nor claimed such interest; thus, the money could not have been attached for its debt. (*Henry* v. *General Forming, Ltd.,* 33 Cal.2d 223 [200 P.2d 785]; *Ward* v. *Waterman,* 85 Cal. 488 [24 P. 930].) Inasmuch as plaintiff has no better right to the funds than CCC, its interest is dependent upon that of CCC in the money and plaintiff's rights are derivative in nature, coequal and coextensive with those of CCC, it follows that any evidence admissible against the latter, were it contending ownership, is admissible against the plaintiff. (Code Civ. Proc., §§ 1849, 1851.) In accord therewith, proof of any failure of consideration in the contract between Walters and CCC or any fraud or deceit on the part of CCC or its breach of the contract to show that the money never passed to CCC is proper against the plaintiff; all existing equities between CCC and Walters are in issue in determining ownership as between Walters and plaintiff, the attaching creditor. (*Kinnison* v. *Guaranty Liquidating Corp.,* 18 Cal.2d 256 [115 P.2d 450].) Thus, there is no merit to appellant's claim that since the issue was narrowed to ownership of the funds in question by the pretrial conference order, Walters was precluded from offering any proof of failure of

consideration, fraud and deceit or breach of contract between him and CCC. Moreover the averment of ownership of property is generally one of ultimate fact.

 It is the rule that a third party claimant may intervene in an action where the property he claims as owner is attached; and that he has sufficient interest therein to enable him to intervene under section 387, Code of Civil Procedure. (*Dennis* v. *Kolm*, 131 Cal. 91 [63 P. 141]; *Berghauser* v. *Golden State Orchards*, 208 Cal. 550 [282 P. 950]; *Carter* v. *Garetson*, 56 Cal.App. 238 [204 P. 1090].) Thus, the complaint in intervention was properly filed.

During pendency of the main action plaintiff dismissed as against all defendants except CCC. CCC having previously disclaimed any interest in the $12,375 (Ex. L) and at no time having claimed any interest therein adverse to him, Walters did not serve CCC with the complaint. Meanwhile CCC failed to appear at the trial of the main action and judgment was taken against it. Later the suit on the intervenor's complaint was heard; the only parties thereto were plaintiff and Walters. Plaintiff tried its case as though CCC had been served, unaware until the trial had been concluded that CCC had not been served with a copy of the summons and complaint in intervention. When plaintiff learned of the failure of service after the conclusion of the trial, some two months before judgment, the case was reopened without ob· jection and by leave of court a copy of the summons and complaint was in fact served upon counsel of record for CCC; and consistent with its disclaimer CCC made no appearance to contest the intervener's claim of ownership to the money. However, plaintiff now argues that the complaint in intervention did not raise any triable issue by reason of the failure to follow the statutory procedure requiring service of the summons and complaint in intervention before trial upon all parties who have appeared and those who have not (Code Civ. Proc., § 387).

 While it is true that summons and complaint in intervention were not served upon CCC before trial in accordance with section 387, it appears under the circumstances that the failure to comply with the section was but a mere technicality which in no way prejudiced plaintiff, and may be disregarded, service having been made upon reopening the case before judgment. Section 387 governs the right to intervene and provides that intervention in an action takes place when one having "an interest in the matter in litigation" is

permitted to become a party either by joining a party "or by demanding anything adversely to both the plaintiff and the defendant," by filing a complaint by leave of court and serving the same "upon the parties to the action ... who have not appeared, and upon the attorneys of the parties who have appeared." The intervener here neither joined the plaintiff nor united with defendant, but demanded funds adverse to plaintiff. CCC at no time having any interest in or claim to the funds or having asserted any claim thereto, and having expressly disclaimed any interest therein (Ex. L), the only party adverse to the intervener was plaintiff. Inasmuch as plaintiff did not know of the lack of service on CCC until after the trial was concluded, it can hardly claim that it suffered prejudice or was in any way inconvenienced by virtue of the intervener's failure to serve CCC *before* trial. Plaintiff certainly was not precluded from presenting any relevant evidence on any question in issue (*Blanc* v. *Paymaster Min. Co.*, 95 Cal. 524 [30 P. 765, 29 Am.St.Rep. 149]) and plaintiff having tried its case on the assumption service had been made on CCC, its presentation of the case was in no way affected. Further the case was reopened and the court granted leave for service of summons and complaint on CCC; by this service it was given the opportunity to object to Walters' claim. Consistent with its disclaimer CCC did not do so and did not appear.

Our courts have excused failure of compliance with section 387 in some respects as a mere technicality. In *Traweek* v. *Draper*, 143 Cal.App.2d 119 [299 P.2d 391], the court held that a "failure to obtain the court's permission to intervene was a mere informality" (p. 122) which should be disregarded. We think the instant case presents a like situation. The intervenor joined issue with the only party who made any claim adverse to him—the plaintiff; no prejudice resulted to plaintiff by virtue of the failure of service on CCC before trial; any defect was cured by service of summons and complaint upon CCC with leave of court after trial but before judgment; and CCC was given an opportunity to appear and answer if it deemed any appearance to be necessary.

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied January 17, 1964.